## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| JOYCE GREUTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:06-CV-00209 |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Joyce Greuter appeals  from a final decision[2] of the Commissioner of Social

Security ("Commissioner") denying Greuter's application under the Social Security Act (the "Act")

for a period of disability and Disability Insurance Benefits ("DIB").  For the reasons set forth herein,

the Commissioner's decision will be AFFIRMED.[3]

## STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and thus he is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2] Greuter filed an application for DIB on July 29, 2002, alleging disability as of January 1, 1999. (Tr. 98-100) She was denied on initial consideration and reconsideration. (Tr. 29-31, 87-90) A hearing was held on October 14, 2004, before the Honorable Frederick McGrath (ALJ). (Tr. 44) Greuter appeared and testified on her own behalf and she was represented by John M. Smith. (Id.) Dr. Leonard Fisher, a Vocational Expert (VE), appeared and testified. (Id.) An unfavorable decision was issued on February 25, 2005. (Tr. 58-67) The Appeals Council granted a review and remanded the case for further proceedings. (Tr. 46-49) A second hearing was held on November 10, 2005, with the same participants except Mr. Joseph Thompson was the VE. (Tr. 511) The ALJ again issued an unfavorable decision on December 14, 2005. (Tr. 11-26) The Appeals Council denied a review making the decision of the ALJ the final one of the Commissioner. (Tr. 6-9, 403-483)

[3] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

1

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). The ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Id.*

Under this standard, the Court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## **DISCUSSION**

To be considered disabled under the Act, a claimant must establish that she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A). The impairment must be severe, causing the claimant to be unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 405.1505-1511.

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404,

Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] 20 C.F.R. § 404.1520; *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant on every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

After following the five sequential steps laid out above and reviewing the medical evidence, the ALJ in this case found that: (1) Greuter had not performed substantial work since her alleged onset date; (2) her physical impairments were severe; (3) her physical complaints did not meet or equal a listed impairment; (4) she retained the residual function capacity to perform some of her past relevant work; and (5) under the Medical-Vocational Guidelines, she  is capable of performing a limited range of sedentary work within the economic region. Of significance in this appeal, Greuter contends that the ALJ erred in his RFC conclusion (which, in turn, led to the finding that she was not disabled) by rejecting her testimony as to her pain and physical limitations, and disregarding the opinion of her treating physician. After a review of the record, the Court shall proceed to a discussion of Greuter's arguments.

### Facts and Medical Evidence

Greuter was 42 years old as of March 31, 2003, which is her date last insured. (Tr. 96, 98)

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"), or what tasks the claimant can do despite her limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

She has a high school education (Tr. 108) and has worked as a receptionist, waitress, and machine tender. (Tr. 103, 139, 148) Greuter alleges disability based upon the following impairments: chronic low back pain, two low back surgeries, failed back surgery syndrome, lumbar degenerative joint disease, major depression, and pain disorder associated with both psychological factors and a general medical condition.

In January 1997, Dr. David Campbell, a rheumatologist, diagnosed fibromyalgia and possible recent disc herniation. (Tr. 338) In November 1997, Greuter underwent a laminectomy and disc excision (Tr. 270-272); however, she continued to have problems with chronic low back pain. (Tr. 266) Given these ongoing problems, Greuter changed jobs from a waitress to working in the kitchen of a new restaurant with the hope that the new work would be less aggravating of her pain. (Tr. 267-268) After more conservative treatment failed to alleviate her problems, Greuter was referred to Dr. John Williams for additional surgery. (Tr. 262-263)

In January 1999, Greuter saw Dr. Williams, complaining of continued back and radicular lower extremity pain. (Tr. 260-261) In March 1999, Greuter reported left leg pain, but she was continuing to walk on a daily basis. (Tr. 259) On examination she had a positive straight-leg raise on the left due to scarring above the nerve roots. (Id.) Dr. Williams placed her on Neurontin.[5] (Id.) X-rays of the lumbar spine showed that it was well-aligned and that there was no change in the hardware. (Id.) The following month, Greuter again saw Dr. Williams and reported that her left leg pain was gone but that she had developed right leg pain. (Tr. 257) On examination straight-leg raise

---

[5]Neurontin is indicated for the treatment of postherpetic neuralgia and epilepsy. Fatigue, somnolence, and dizziness are very common side effects of this medication. Physician's Desk Reference 2500-2501 (60th ed. 2006) (hereinafter "PDR").

on the right was positive. (Id.) Dr. Williams placed her on Baclofen[6] and a physical therapy program. (Id.)

About six weeks later, Greuter reported to Dr. Williams that she no longer experienced left leg pain but she had pain in the right buttock, thigh, and leg. (Tr. 256) On exam the straight-leg raise test was positive on the right. (Id.) X-rays were negative except for a trace of spondylolisthesis at L4-5. (Id.) A lumbar myelogram CT scan was ordered, which showed postoperative changes, but otherwise was relatively unremarkable. (Tr. 254-256) In June 1999, Greuter reported to Dr. Williams that her symptoms were improving. (Tr. 253)

On September 21, 1999 Greuter consulted with Dr. Hatch for an evaluation of significant low back and right leg pain. (Tr. 153-154) She reported her pain at a 6 to7 out of 10 in intensity. (Id.) She further described the pain as a deep bone pain, reported that this pain had been persistent since November 1996, and that it affected her activities and her relationship with her husband. (Id.) She stated that she was  working, but having difficulty. (Id.) She admitted to depression secondary to her disease. (Id.) On physical exam her low back showed mild lumbosacral tenderness to deep palpation. (Tr. 154) Straight-leg raising caused back pain, and there was some evidence of right sacroiliac joint pain. (Id.) Dr. Hatch's assessment was low back and right hip and leg pain with a history of failed back syndrome. (Id.) He found that her pain was likely related to right sacroiliac joint pain, as well as possible scar tissue and degenerative arthritis. (Id.) He concluded that nerve blocks were not warranted and placed her on Oxycontin,[7] a continuous release pain medication. (Id.) In October,

---

[6]Baclofen is a generic name of a medicinal substance having muscle-relaxing properties. J.D. Schmidt, M.D., Schmidt's Attorneys' Dictionary of Medicine, Volume 1 B-6 (1994) (hereinafter "Schmidt's").

[7]Oxycontin is indicated for the management of moderate to severe pain on a continuous, around-the-clock analgesic as needed for an extended period of time. Somnolence and dizziness are quite common side effects of this medicine. PDR at 2701-2702.

Greuter reported to Dr. Hatch that she was receiving benefit from the Oxycontin. (Id.) Dr. Hatch then referred Greuter to her primary care physician for follow-up. (Id.)

On December 17, 1999, Dr. Emilio D. Vazquez became Greuter's primary care physician. (Tr. 232)  Dr. Vazquez noted the September and October reports of Dr. Hatch. (Id.) Greuter told him that the Oxycontin resolved her pain to some degree, but it did not completely control it. (Id.) On physical exam she weighed 171 pounds, which was a 5 pound gain over her last visit. (Id.) She ambulated with an apparent limp, and her neurologic exam was normal. (Id.) Dr. Vazquez changed her pain medication and instructed Greuter to set up a maintenance physical therapy program. (Id.)

On January 11, 2000, Greuter saw Dr. John Ott, a psychologist. (Tr. 243-244) She reported chronic pain in her back and indicated that she had surgery in January 1999, which alleviated the nerve pain in her leg but did not reduce her overall back pain. (Id.) She reported feeling depressed with increased sleep desire without ability to sleep well, tiredness and fatigue, and an increase in appetite with weight gain, crying spells, increased irritability, social withdrawal, reduced libido, reduced interest in other activities, reduced motivation, reduced concentration, reduced memory, and inability to make decisions. (Id.) She indicated that she stayed active by going to help at her son's school, attending church, and reading religious material. (Id.) She told him that resting such as lying down and curling up in a fetal position and the use of a heating pad had helped her back pain. (Id.) His diagnosis was (1) pain disorder associated with both psychological factors and a general medical condition; and (2) major depressive disorder, single, severe. (Id.) He gave her a Global Assessment of Functioning (current) of 51. (Id.)

A few days later she saw Dr. Vazquez and reported her visit to Dr. Ott. (Tr. 230) She indicated that Dr. Ott suggested that she try a different antidepressant. (Id.) She complained of

fatigue and a lack of energy, but had no suicidal ideations or hallucinations. (Id.) On physical exam he found that she had a slightly depressed mood but normal affect. (Id.) He diagnosed depression probably secondary to chronic pain syndrome. (Id.)

About a week later Greuter saw Dr. Vazquez to discuss her medicines for pain. (Tr. 228) She was still having considerable pain, and she was using the Oxycontin SR once a night and sometimes up to twice in the mid-afternoon and Vicodin ES at least one per day. (Id.) She did return to work a few hours a day, but she attributed the increase in pain to her returning to work. (Id.) She was able to ambulate, but she got off the table slowly. (Id.) She had a negative neurologic exam of the lower extremities with a negative straight-leg raising test. (Id.)

At the end of February 2000, Greuter returned to Dr. Vazquez for chronic back pain. (Tr. 227) Greuter was traveling and requested medication prior to her flight to calm her nerves and help her to sleep. (Id.) He prescribed Xanax[8] and Ambien.[9] (Id.) He also discussed her use of Methadone[10] for pain control, and she believed it was working well. (Id.)

A month later, Greuter saw Dottie Boyce for decreased libido. (Tr. 222) She reported that she had been on Oxycontin, which was cost prohibitive, and that she switched in February to Methadone. (Id.) Over the last several weeks and possibly prior to beginning Methadone, her libido had decreased. (Id.) She was under quite a bit of stress at the present because a close friend had a recurrence of breast cancer, and her husband anticipated a job change in the near future. (Id.) She

---

[8]Xanax is indicated for the treatment of panic disorder. Sedation, somnolence, and fatigue are side effects of the medicine. PDR at 2656 and 2658.

[9]Ambien is indicated for the short term treatment of insomnia. PDR at 2868.

[10]Methadone is a narcotic drug prepared synthetically which may be used for pain relief. Schmidt's, Volume 3 at M-113.

was pleased that she was able to work part-time. (Id.) She paced herself to restrict her activity, and she walked one mile several times a week. (Id.) However, this additional exertion caused increased back pain. (Id.) On physical exam she weighed 172 pounds. (Id.) Her affect was appropriate. (Id.) Methadone was continued. (Id.)

In early June, Dr. Vazquez saw Greuter for persistent pruritus, which had worsened. (Tr. 212) She had discontinued the Methadone to see if that would help, but it did not. (Id.) She was also having anxiety secondary to her daughter leaving home. (Id.) On physical exam she had an anxious appearance. (Id.) She also had diffuse areas of excoriation on the arms and legs. (Id.) Methadone was restarted. (Id.)

In July Greuter began having some right elbow pain when in an effort to lose weight she had started an exercise routine which involved her elbows. (Tr. 211) On physical exam she weighed 179.5 pounds. (Id.) She had tenderness in the upper right extremity. (Id.) At her August visit she reported that her right elbow problem had completely resolved, but she had slipped and fell on her right side recently. (Tr. 210) On physical exam there was an area of tenderness on her right buttocks along the right sacroiliac joint above the scar where she had a bone graft done for her back surgery, but there was no tenderness in the sciatic notch. (Id.)

Intermittently between April and August 2000, Greuter saw Dr. Vazquez for problems with her medicine regimen. (Tr. 209) Much discussion occurred at these visits regarding the appropriate medications and pain relief options. (Id.) At the late July visit, Dr. Vazquez noted that she had been to Dr. Hatch and to Dr. Ott, but that she had been unable to resolve her pain problem. (Id.) His assessment was chronic back pain with increasing use of medicines, which was probably due to her increase in activity and some building tolerance from her long use of narcotics. (Id.) He also found

that she had constipation secondary to the medicines. (Id.) He did not believe that she was abusing the narcotics, but she was using more due to her increased activity levels. (Id.) He gave her a prescription for constipation. (Id.) He discussed with her the possible use of implantables for pain control. (Id.)

On October 24, 2000, Greuter returned to Dr. Vazquez due to pain in the sacroiliac joints, and she wanted an injection there because she was scheduled to leave for a trip to Florida. (Tr. 207) On physical exam she was found to be mildly overweight as she weighed 187 pounds. (Id.) She was able to ambulate only by favoring her right side. (Id.) On palpation of the back she had pain over the right sacroiliac joint and down into the upper leg which radiated into the posterior buttocks and the backs of the legs but did not radiate below the knees. (Id.) Movement forward caused pain, and she had a positive pelvic rock test. (Id.) He performed an injection in her sacroiliac joint, and she had relief of some of the discomfort after about 10 minutes. (Id.) She was given Lorcet. (Id.)

On December 1, 2000, she saw Dr. Ronald VanDerNoord. (Tr. 191-194) She reported that the fusion did relieve the lower extremity symptoms, but she continued to suffer from axial low back pain. (Tr. 191) She localized the pain to the inferior lumbosacral region as well as over the right sacroiliac joint. (Id.) On physical exam she was 67 inches tall and weighed about 180 pounds. (Tr. 192) She was in a mild degree of distress, and she did not display any inappropriate pain behavior at the evaluation. (Id.) Gross evaluation revealed a mildly antalgic gait, but she was grossly normal in motor and sensory function. (Id.) X-rays showed a stable L4-S1 fusion. (Id.) His diagnosis was chronic segmental low back pain/failed back surgery syndrome, secondary lumbosacral biomechanical/sacroiliac dysfunction (right greater than left), no clinical evidence of lumbar radicular or stenotic pathology, and no findings consistent with upper motor neuron process. (Tr.

193) The two discussed at length various pain management options, but ultimately concluded that her current medication regimen was the best treatment course. (Id.)

In January of 2001 Greuter returned to Dr. Vazquez for a shot in her right arm and to discuss her chronic back pain. (Tr. 190) Greuter told Dr. Vazquez that she was going to pursue disability as she was unable to get a "real job" other than in the restaurant where she is known and can deal with the pain problems, but she can only work on a very part-time basis. (Id.)

In May 2001 she saw Dr. Vazquez for intense right sided pain. (Tr. 177) He reviewed her pain management history and noted that she had no good pain management options. (Id.) She had been doing relatively well with her current medicine regimen until approximately three weeks prior when she began experiencing a severe right sided pain, which was in the back and a stabbing and very intense pain. (Id.) It hurt her to walk, run, sit or perform any other major motion. (Id.) On physical exam on palpation of the musculature of the back she had a very specific area of extreme tenderness just to the right of the L4-5 region, which caused her the greatest pain. (Id.) He did not find any true sciatic notch tenderness, and her straight-leg raising test was negative. (Id.) He injected the painful area and concluded that the pain was probably due to muscle spasm with a component of nerve impingement, but he doubted it was discogenic pain. (Id.) Her medicine regimen was continued. (Id.) If her pain did not resolve or worsened, Dr. Vazquez indicated he would refer her to a surgeon. (Id.)

Two weeks later, Greuter returned for back and abdominal discomfort. (Tr. 175) Dr. Vazquez discussed with her a referral to her previous surgeon. (Id.) She reported that the OxyIR did not seem to help. (Id.)

On August 15, 2001, Greuter saw Dr. Kevin A. Rahn, an orthopaedic surgeon. (Tr. 165-166)

10

She reported that although the surgery had resolved her leg pain, it had not resolved her low back pain. (Tr. 165)  On physical exam she was 67 inches tall and weighed 180 pounds. (Tr. 165) Her pain was a 5 on a scale of 1 to 10. (Id.) Straight leg raising was negative bilaterally for any leg pain. (Id.) Range of motion for her hips and back was normal, and she had no paraspinals muscle spasm. (Tr. 166) His diagnosis was low back pain. (Id.) He recommended a myelogram CT of the lumbar spine to evaluate the neurological structures. (Id.) He indicated no restrictions from his standpoint. (Id.)

Greuter did not see Dr. Vazquez again until December 2001. (Tr. 161) At that time, she complained of intermittent episodes of hip pain, probably due to her altered mechanics. (Id.) She had been doing well on the Lorcet. (Id.) On physical exam she weighed 214 pounds, which she described as moderately obese, and when she ambulated she favored the right side. (Id.) There was tenderness over the right sacroiliac joint, but no tenderness over the sciatic notch. (Id.) Her straight leg raises were negative bilaterally. (Id.) His diagnosis was sacroiliitis, and he injected the joint. (Id.) She had a significant decrease in the pain after 15 minutes. (Id.)

On September 30, 2002, she was given a disability examination by Dr. Michael E. Holton at the request of the Social Security Administration. (Tr. 273-276) She told him that she was able to perform dressing and hygiene measures independently, but she could generally sit at most for 20-30 minutes, stand for 10-15 minutes, and walk up one flight of stairs without significant discomfort or difficulty. (Tr. 273) She also reported that she was told by her physician not to lift over 10 pounds. (Id.) On physical examination she was 67 inches tall and weighed 217 pounds. (Id.) She had a normal gait and station, but she demonstrated mild antalgic features favoring the right lower extremity when walking on heels, toes, and tandem walking, as well as brief hopping and partial

11

squat. (Tr. 274) There was also a mild slowing. (Id.) He found palpable tenderness of the lumbar paravertebrals, and she had guarding of the hips on active range of motion testing. (Id.) On neurological evaluation she showed normal muscle strength. (Id.) Her sensory exam revealed light touch comparative losses in L4, L5 and S1 dermatomes of the left lower extremity. (Id.) Straight-leg testing was negative bilaterally. (Id.) His diagnosis was chronic low back pain. (Tr. 275)

Greuter saw Dr. Vazquez in October for right hip pain and for an injection. (Tr. 278) On exam she had tenderness over the right sacroiliac joint, and she was administered an injection. (Id.) She saw him again in February of 2003 for spots on her face and to discuss her neck and back pain. (Tr. 353) She was having more neck and back pain, and she had been treating herself with her home medications, which were helping. (Id.) She also had some massage therapy, which also helped. (Id.) On physical exam she was overweight at 218 pounds, and she appeared to be in some discomfort. (Id.) Palpation of the neck revealed tenderness along both superior borders of the trapezius, and there were some areas of spasm and some "knots." (Id.) He found that her back was tender as before and that she had some sciatic and sacroiliac tenderness on the right. (Id.) They discussed her neck and back pain for about 10 minutes, and at that time she wanted to try some sort of physical modality, which the doctor thought to be reasonable. (Id.) He suggested physical therapy. (Id.)

On March 27, 2003, Greuter had another disability examination with Dr. Holton. (Tr. 285-288) The doctor reported that she alleged disability due to increased pain in the back and hips and that her medicines resulted in fatigue and difficulty concentrating. (Tr. 285) She said that she could generally sit for up to 30 minutes, stand for about 10-15 minutes, and walk up only one flight of steps without significant increased difficulty. (Id.) On physical exam she appeared uncomfortable, and she shifted her weight frequently. (Id.) He observed moderate halting features with apparent

increased low back discomfort when she got out of the chair and off and on the examination table. (Id.) She was 66 ¾ inches tall and weighed 216 pounds. (Id.) She had an antalgic gait favoring the right lower extremity with mild associated slowing and occasional lurching features. (Tr. 286) She performed heel and toe walking, tandem walking, and partial squat gingerly, favoring the right lower extremity to a mild degree. (Id.) He omitted hopping due to a concern over her safety. (Id.) There was no reproducible tenderness of the lumbar paravertebrals. (Id.) There was a guarding of her right hip on active range of motion testing. (Id.) Her muscular strength was normal, and there was no evidence of atrophy or muscle spasm. (Id.) There were no gross sensory deficits. (Tr. 286-287) His diagnosis was chronic low back and right hip pain status post lumbar surgery and chronic pain syndrome. (Tr. 287)

State Agency physicians Dr. B. Whitley and Dr. A. Dobson agreed that Greuter could perform light work with some nonexertional limitations. (Tr. 289-296) Dr. W. Shipley and Dr. J. Pressner, State Agency psychologists, found that she had no severe mental impairment. (Tr. 297-300)

Greuter saw Dr. Vazquez again in August 2003. (Tr. 380) She reported that she was now having more pain, especially on the right radiating into the right hip. (Id.) She was going on vacation to Canada with her family, and as they were driving she requested a two week supply of Lorcet, as well as a few Ambien to help her sleep. (Id.) Dr. Vazquez found that as she decreased her activity her weight had ballooned, which had not helped matters. (Id.) On physical exam she weighed 227.5 pounds, and she appeared to be in some discomfort. (Id.) Her mood was depressed, and her affect was somewhat sad. (Id.) She had some tenderness along the right sciatic notch, but not the right sacroiliac joint. (Id.) There was full range of motion of her lower extremities, and the straight-leg

raising test was negative. (Id.) She ambulated favoring her left side, and she stood with her hips tilted. (Id.) He increased her Elavil to 150 mg, and he gave her some Ambien samples. (Id.) He also diagnosed mild to moderate underlying depression. (Id.) He also recommended that she see her surgeons, and she indicated that she would do so once she gets her disability settled. (Id.)

Dr. Vazquez provided a medical source statement dated April 25, 2005. (Tr. 385-386) He found that her pain was not well-controlled by medication, as she still complained of pain anywhere from a 4 to 7 on a 10-point scale. (Tr. 385) He found that she alleviated the pain somewhat by shifting sitting to standing to lying positions, though she gets most of her relief in the lying position. (Id.) He reported that she was taking relatively potent narcotic pain medication that made it somewhat difficult for her to concentrate and persist in tasks that require marked attention. (Id.) She was undergoing medical treatment in the form of pain medication and physical therapy, which she had tried in the past without success. (Id.) Furthermore, she stated that she could not afford the physical therapy due to financial constraints. (Id.) He also indicated that, having undergone the physical therapy in the past, it was not certain that it would benefit her. (Id.) Although he noted that surgery was an open question, in his opinion any further surgery would be worthless due to the previous unsuccessful resolution. (Id.) He found that she would not be able to return to work in any capacity because she was unlikely to be able perform work for an 8-hour workday, as she needed to get off her feet about every hour or so for 10-15 minutes. (Id.) He also found that she would be likely to miss work at least once a week, and she would likely be unable to perform an 8-hour workday without hourly breaks. (Id.) In regard to her depressive symptomatology he noted that she had been treated with medications for the problem, but because of financial constraints she was unable to obtain any psychiatric help. (Tr. 386) It was his opinion that psychiatric intervention, other

than therapeutic counseling, would not necessarily be worthwhile as her underlying problem was back pain. (Id.)

**Summary of Vocational Expert Testimony**

At the second hearing, Joseph Thompson testified as a vocational expert. (Tr. 524-526) The ALJ asked the vocational expert to consider a hypothetical individual with Greuter's age, education, and prior relevant work experience and the following RFC: sedentary exertional level work with a sit-stand option; no crouching, crawling, no climbing of ladders, ropes, or scaffolds; no concentrated exposure to unprotected heights and dangerous machinery; and limited to only occasional bending. (Id.) Thompson testified that the hypothetical individual could perform Greuter's past work as a receptionist (1,500 regional jobs) and that she could perform other work that existed in significant numbers in the national economy (over 1,000 regional jobs), citing as examples an information clerk, an appointment clerk, and an order clerk. (Id.)

In response to Greuter's counsel's questions, Thompson further indicated that if the hypothetical individual had the restrictions set out by Dr. Vazquez, such an individual would be unemployable. (Tr. 527)

**Arguments**

Based upon this evidentiary record, the ALJ reached the conclusion that Greuter was not disabled because she retained the RFC to perform some of her prior relevant work and she retained the ability to perform a reduced range of sedentary work that allowed for a sit/stand option and that restricted her from crouching, crawling, or climbing. (Tr. 24-25) The Court turns now to an examination of Greuter's arguments that the ALJ erred in his analysis and conclusion.

**Credibility**

15

Greuter first contends that the ALJ erred by improperly evaluating her credibility when he assessed her impairments and RFC. When assessing an individual's credibility, the ALJ must consider evidence in the record regarding the individual's daily activities as they relate to her symptoms and treatment regimen. *See Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003); 20 C.F.R. § 404.1529; SSR 96-7p. The ALJ may not ignore subjective complaints of pain solely because they are unsupported by medical evidence, *Schmidt v. Barnhart,* 395 F.3d 737, 746-47 (7th Cir. 2005), but may consider discrepancies between the objective medical evidence and the degree of pain complained of, *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir. 2005); *Powers v. Apfel,* 207 F.3d 431, 435-36 (7th Cir. 2000). Because the ALJ is best positioned to judge a witness's truthfulness, the Court will overturn an ALJ's credibility determination only if it is patently wrong, *Schmidt,* 395 F.3d at 746-47, or if the reasoning behind the ALJ's credibility determination "does not build an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), since, in such a case, the ALJ's decision is based on "serious errors in reasoning rather than merely the demeanor of the witness." *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2000). As is detailed below, the Court concludes that the ALJ supported his credibility determination with a reasoned discussion of the record in light of these rules.

In his Decision, the ALJ reviewed Greuter's testimony and specifically enumerated her reports of pain and limitations, taking into account her testimony from both hearings. The ALJ wrote:

> Ms. Greuter initially testified that she was unable to work due to constant muscle aching related to fibromyalgia and pain at an intensity level of six to seven with her medication, Methadone. The claimant elaborated that she was unable to get out of bed if she did not take her medications. She described medication side-effects of confusion, dry-mouth, and constipation. She related that her doctors suspected she might have rheumatoid arthritis. The claimant explained that she tried to go back to

16

work as a hostess, but could not stand very long due to severe pain. She added that she was unable to work on a regular basis due to her inabilities to sit and stand. The claimant was observed to ambulate with a cane.

Mrs. Greuter further testified regarding her typical daily activities, stating she got up, performed personal hygiene with difficulty; dressed herself; lay back down; checked on her children; did dishes; swept; went grocery shopping; and drove short distances. She elaborated that throughout the day she was up and down and spent most of her day in her bedroom.

At the second hearing, the claimant clarified that she only drove once a week and when she went grocery shopping it was with her son or husband. She added that she only spent one hour a day helping her son with his home schooling. She stated that she used to help out at school before her surgery, but was no longer able to. She continued that there were some days she could not get out of bed and went to church only occasionally. The claimant explained that Methadone made her feel constantly tired. She related an inability to concentrate and fuzzy vision with reading.

Mrs. Greuter further testified that she could not work as a waitress as she was unable to stand or walk without being in pain. She related that even with medication her pain was constant. She responded that if she had a job, she would have to be off her feet every hour or so for fifteen to twenty minutes. She added that she would miss at least one day a week. The claimant explained that she used a cane to steady herself. She indicated that she had been seen by a rheumatologist for joint and muscle pain and that Dr. Vazquez [sic] was talking about giving her shots in her hip.

(Tr. 17-18)

After considering the above testimony together with the medical evidence, the ALJ concluded that Greuter's "allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision." (Tr. 25) Greuter challenges the ALJ's finding that she was not entirely credible, arguing that the ALJ failed to properly consider the medical evidence, the impact of her psychiatric problems and obesity in combination with her underlying disabilities, and her testimony concerning daily activities, subjective complaints of pain, and the side effects of her medications. *See* SSR 96-7 (requiring ALJs to supply "specific reasons" for a credibility finding).

A review of the decision reveals that the ALJ carefully traced the medical record throughout

17

the insured period (and beyond) and noted that while the medical evidence does reflect a history of low back pain treated by decompressive laminectomy and fibromyalgia, "the diagnostic studies failed to reveal abnormalities that would support the claimant's level of pain." (Tr. 18) The ALJ noted that the x-rays taken in March 1999 showed her instrumentation to be in good position and that subsequent x-rays several months later did not show any abnormalities. Moreover, the ALJ pointed out that her surgeon imposed no restrictions. The ALJ further remarked that despite her reports of pain throughout 1999, other diagnostic tests, including a myelogram and a CT scan, indicated the absence of disc bulging, herniation, stenosis, and gross impingement on the thecal sac. Greuter's orthopedist also advised her that she could engage in activities as tolerated.

The ALJ's analysis of the medical evidence, however, did not end here. The ALJ also examined the records of Dr. Hatch and Dr. Vazquez. With respect to Dr. Hatch, the ALJ indicated that the records reflected good response to pain management and that these records were "inconsistent with the claimant's allegations." (Tr. 19) The ALJ further specified that portions of Dr. Vazquez's records "support the claimant's allegation of increased pain with standing, but also suggest that she was able to do some limited standing and walking activities, i.e. exercising to lose weight, being involved in a walking program, and taking a trip to Florida." (Id.)

The ALJ further considered the records, including test results, and the diagnoses of Dr. VanDerNoord at the end of 2000, noting that they "failed to reveal physical findings that would support the claimant's allegation of a complete inability to work." (Id.) Her x-rays revealed that her fusion was stable and that there was no clinical evidence of lumbar radicular or stenotic pathology.

The ALJ also reviewed the medical evidence of orthopedist, Dr. Rahn, and concluded that the evaluation "did not reveal any abnormalities to support her allegation of disabling pain." (Tr. 20)

He also noted the absence of any restrictions or limitations by Dr. Rahn.

Throughout 2002, the ALJ noted visits to Dr. Vazquez and an examination by Dr. Horton, observing that with respect to Dr. Vazquez, Greuter had flare-ups of pain managed by injections and oral medications.  The ALJ also noted Greuter's own reports to Dr. Vazquez's nurse practitioner in 2002 that she had been able to increase her aerobic activity and was pleased that this increase had not required additional pain medication. With respect to Dr. Horton, the ALJ found that she had some tenderness of the lumbar paravertebrals and decreased range of motion in the cervical and lumbosacral spines, the hip, and lower extremities, but also noted that she displayed normal muscular strength and tone, normal gait and station, and only a mild degree of difficulty performing heel/toe/tandem walking maneuvers.

Finally, the ALJ considered evidence from March 2003 that suggested a worsening of Greuter's condition. For instance, he noted that a second evaluation by Dr. Horton confirmed that she had an apparent increase in low back discomfort, had difficulty getting on and off the examining table, and exhibited an antalgic gait with mild associated slowing and lurching features. The ALJ also noted that in contrast to this evidence, in February and March 2003 Greuter reported to Dr. Vazquez's nurse practitioner that she was trying to walk on a daily basis and increase her exercise regimen.

Despite this thorough examination of the record, Greuter sets forth a number of criticisms of the ALJ's credibility determination, none of which are sufficient to garner a reversal of the ALJ's decision. What Greuter's arguments do demonstrate is that the ALJ had evidence before him that both supported and detracted from her credibility. In such an instance, "the resolution of competing arguments based on the record is for the ALJ, not the court." *Donahue v. Barnhart*, 279 F.3d 441,

444 (7th Cir. 2002).

The record, for instance, contains multiple references to Greuter's limited financial means which could, in fact, support a conclusion that she failed to follow through on treatment options presented to her due to financial limitations. Yet, the record is equally clear, and the ALJ reasonably questioned Greuter's statements, that Greuter traveled on multiple occasions when she claimed financial constraints. Indeed, the ALJ's explanation set out the competing evidence, but ultimately concluded that the evidence impacted Greuter's credibility:

> The [ALJ] is not unmindful of the claimant's testimony that she had no money for medical treatment, Dr. Vazquez's statement that she could not afford treatment, and Attorney Smith's argument that she could not afford medications. However, the undersigned is mindful of the claimant's financial ability to afford vacation trips throughout the course of her treatment and remains unimpressed with the proposition that she could not afford health care.

(Tr. 24) Given the above rationale, this is not a situation where the ALJ ignored evidence in the record which would have supported Greuter's credibility; rather, the ALJ reasonably considered whether, in light of her admission to traveling, her symptoms were as severe as alleged and whether financial limitations truly existed.

Likewise, the ALJ did, contrary to Greuter's assertion, consider in detail whether Greuter's claim of a  mental impairment, namely depression, was severe.[11] To this end, he relied upon the

---

[11] Greuter also argues that the ALJ failed to consider the effects of her obesity on her underlying impairments. According to SSR 02-1p, an ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment. *See Clifford,* 227 F.3d at 873. But a failure to explicitly consider the effects of obesity may be harmless error. *See Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004) (finding harmless error and concluding that "although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions."). In this case, the ALJ did not separately consider Greuter's obesity, nor does Greuter point to any evidence that the ALJ should have considered that her obesity did, in fact, aggravate her physical impairments. Despite the absence of an explicit reference to Greuter's obesity, the ALJ did specifically predicate his decision upon the opinions of physicians who did discuss her weight. In this case, this was sufficient consideration. *See Prochaska v. Barnhart,* 454 F.3d 731, 737 (7th Cir. 2006) (concluding that where the ALJ considered medical reports noting the claimant's height and weight and the record did not identify obesity as significantly aggravating her physical impairments, there is no error).

statements from two state agency psychologists that indicated she did not suffer from a severe mental impairment, as well as her own medical records that indicated minimal treatment of her depression and only sporadic complaints to physicians as to her mental condition, none of which were alleged to have impeded her daily activities or increase her pain. The ALJ set out, for instance, that the State Agency psychologists "found that the claimant's [depression] caused her to experience only mild limitations in her abilities to engage in daily activities; maintain social functioning; concentrate; persist; and keep pace." (Tr. 15) Thus, it was reasonable for the ALJ to conclude that her depression did not limit her ability to function on a daily basis or contribute to her pain and thus decline to consider it further.[12]

The ALJ also examined Greuter's statements of progressively worsening symptoms, inability to walk, and difficulty with daily tasks. Yet, he also reviewed medical records wherein her physicians recommended physical therapy and exercise and noted that during at least one time when Greuter reported worsening symptoms, she left for a two week vacation.  (Tr. 19, 21 ("The undersigned notes that despite the claimant's complaints of increased pain she had made plans to go on a two week vacation, driving to Canada with her family.")) Records also confirmed that Greuter reported engaging in exercise and a walking regimen and, thus, the ALJ concluded that these reports called into question Greuter's credibility as to the progression of her symptoms.

The crux of all this is that the ALJ in this case gave numerous reasons throughout the decision for his assessment of Greuter's credibility and built the requisite "logical bridge" between the evidence and his conclusions.  A fair reading of the ALJ's decision demonstrates a conscientious

---

[12]Interestingly, even Dr. Vazquez noted in his most recent Medical Source Statement that psychiatric intervention, other than therapeutic counseling, would not necessarily be worthwhile because the underlying problem was back pain.

review of the medical evidence presented in combination with consideration of Greuter's testimony. Indeed, when assessing whether an ALJ has built an accurate and logical bridge between the evidence and the result, the ALJ's decision should be given "a commonsensical reading rather than nitpicking at it." *Johnson v. Apfel,* 189 F.3d 561, 564 (7th Cir. 1999). In this case, the ALJ described the inconsistencies he found in the record. He did not merely issue a conclusory statement as to Greuter's credibility. Clearly, inconsistencies with the record are a valid basis on which to discount a claimant's credibility. *Knight v. Chater,* 55 F.3d 309, 314 (7th Cir. 1995). Accordingly, the Court finds that the ALJ did not err in his credibility determination, and his conclusion is supported by substantial evidence.

### Treating Physician

Greuter also contends that the ALJ erred when he afforded little weight to the opinion of her treating physician, Dr. Vazquez, when determining her RFC. The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford,* 227 F.3d at 870. Where the ALJ concludes that the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner.  20 C.F.R. § 404.1527(d). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows

22

that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [he] is not." *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir. 1999).

The ALJ concluded that Greuter retained the RFC to perform sedentary work activities that provide for a sit/stand option, but that she could not crouch, crawl, or climb ladders, rope, or scaffolds. This conclusion was reached after reviewing and rejecting much of the opinion of Dr. Vazquez as it related to her limitations. Greuter argues that the ALJ should have accorded more weight to Dr. Vazquez's conclusions regarding her limitations, claiming that the ALJ improperly speculated about the timing of Dr. Vazquez's submission and the reasons for Greuter not returning to Dr. Hatch when she had received good pain relief results; failed to consider her obesity in combination with the other medical evidence; and failed to consider facts showing a dramatic change in her condition. She further asserts that the ALJ did not consider various favorable diagnostic studies supporting Dr.Vazquez's conclusions and that he failed to consider the length and treatment relationship between herself and Dr. Vazquez.

The ALJ considered Dr. Vazquez's more extreme limitations and set forth various reasons for attributing less weight to those limitations. The ALJ began by specifically setting forth the opinion of Dr. Vazquez taken from his letter dated April 25, 2005, wherein Dr. Vazquez noted that Greuter: (1) was in constant pain ranging for a 4 to 7 level of intensity, (2) was on potent narcotic medications which made concentration difficult, (3) obtained the best pain relief from lying down, (4) was unlikely to be able to perform throughout an eight hour workday, (5) would need hourly breaks of 10-15 minutes, and (6) would miss work one day per week due to her pain.

The ALJ then questioned Dr. Vazquez's assessment of the claimant's ability to work because "neither Dr. Vazquez's assessment nor the claimant's testimony is supported by a functional

23

capacity evaluation or a work hardening program." (Tr. 23) The ALJ did, however, ultimately conclude that because Dr. Vazquez opined that further physical therapy would be "worthless," it was not inconsistent for Greuter not to undergo these particular evaluations.

Yet, the ALJ remained skeptical of Dr. Vazquez's opinion when compared to the objective medical evidence. He acknowledged that while Greuter is treated with potent narcotic medication, his statement that she was unable to perform any significantly long or complex task due to her pain and medication-induced lack of concentration was questionable. He then noted that medication adjustments and evaluations had been made in response to the claimant's complaints regarding the cost of medications, twitchy nerves in her legs, breakthrough pain, increased pain due to activity, heart palpitations, breast discharge, vasomotor symptoms, pruritus, constipation, and upset stomach, but there was no evidence of any complaints regarding problems with concentration, attention, confusion, constant fatigue, and fuzzy vision. The ALJ also took special note that Dr. Vazquez decided not to prescribe Duragesic patches to Greuter for pain due to the fairly high side-effect of narcotic sedation. (Tr. 23)

Moreover, given the timing of Dr. Vazquez's assessment of work capacity, i.e., two days before Greuter's attorney filed her appeal, the ALJ suspected that Dr. Vazquez's letter was based on Greuter's subjective reports of symptoms rather than a complete diagnostic work-up. He likewise noted that "the evidence reflects a dramatic worsening of the claimant's complaints without corresponding findings upon physical exam." (Tr. 24) He then pointed out that previous diagnostic test results failed to reveal any abnormalities and, in fact, showed Greuter's fusion to be stable. In addition, the ALJ relied upon the records of the orthopedic specialists who treated or evaluated Greuter and specifically noted that these specialists declined to impose any work restrictions. For

24

instance, he observed that Dr. John Williams recommended a daily walking program and back exercises and that Dr. Kevin Rahn assessed that there were no restrictions.

The ALJ further considered Greuter's subjective complaints of pain in combination with Dr. Vazquez's statements that the pain was constant, not well controlled by medication, and ranged from 4 to 7 in intensity. However, the ALJ also observed that Greuter had reported good results with her treatment from pain management specialist, Dr. Stephen Hatch, and despite these good results she did not return. He inferred from this evidence that her pain had not significantly worsened. Moreover, the ALJ pointed to evidence in the record that when Greuter was evaluated by orthopedist, Dr. VanDerNoord, she reported that her pain was pretty well controlled. (Tr. 23-24)

Tracing his path of reasoning, the ALJ in this case made a careful consideration of the full record including medical evidence and Greuter's testimony, but found substantial conflicts in the evidence, which warranted assigning a lesser weight to Greuter's treating physician's claim that she was totally unable to work. Indeed, the mere statement by a treating physician stating that a claimant is "unable to work" or "disabled" is not the beginning and end of the inquiry. *Clifford*, 227 F.3d at 870. Rather, the determination of disability is reserved to the Commissioner. *Id.* Moreover, Greuter's burden is hefty; she must show that no reasonable person could have reached the same conclusion as did the ALJ when evaluating the record as a whole. *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995). And, in this case, she simply cannot meet this burden.

Indeed, contrary to Greuter's assertions that the ALJ erred in assigning an appropriate weight to the opinion of Dr. Vazquez, the record demonstrates that the ALJ considered the supporting evidence, diagnostic tests, the consistency between Dr. Vazquez's opinion and the record as a whole, as well as the underlying relationship between Greuter and Dr. Vazquez, and that he drew reasonable

conclusions from this record. The ALJ was entitled to make reasonable inferences from the evidence before him, *see, e.g., Sample v. Shalala,* 999 F.2d 1138, 1143 (7th Cir. 1993), and the inferences drawn here were eminently reasonable given the record. Accordingly, the ALJ's determination as to Greuter's RFC is supported by substantial evidence.

## **CONCLUSION**

In sum, the ALJ's determination that Greuter was not disabled as of the date her insured status expired has the support of substantial evidence in the record. Accordingly, the decision of the Commissioner is AFFIRMED.

Entered: May 11, 2007

s/ Roger B.Cosbey
Roger B. Cosbey
United States Magistrate Judge